# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 24, 2010

## STATE OF TENNESSEE v. DANNY LYNN DAVIS

**Appeal from the Criminal Court for Washington County**
**No. 34089  Robert E. Cupp, Judge**

_____

**No. E2009-02538-CCA-R3-CD - Filed February 18, 2011**

_____

The Defendant, Danny Lynn Davis, was convicted at a bench trial in the Washington County Criminal Court of theft of property valued at $60,000 or more, a Class B felony; official misconduct, a Class E felony; and twenty-five counts of forgery, Class E felonies. See T.C.A. §§ 39-14-103 (theft); 39-16-402 (official misconduct); 39-14-114 (forgery). He was sentenced to ten years for the theft conviction and to one year for each of the Class E felony convictions, all to be served concurrently with one year of split confinement and the remaining nine years on probation. In this appeal, the Defendant contends that (1) the victim, the city of Johnson City, had no standing to allege the crimes, (2) the prosecution of the forgery and official misconduct offenses was barred by the statute of limitations; (3) the evidence was insufficient to support his convictions; (4) the trial judge should have recused himself because the judge's wife was an employee of the city of Johnson City; and (5) he was deprived of the opportunity to prepare a proper defense because the trial court failed to release his income tax records during discovery. We note that two of the convictions were rendered on counts dismissed by the State during trial. We vacate the convictions for forgery in Counts 23 and 27, but we affirm the remaining judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Vacated in Part, Affirmed in Part**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Clifton Corker and Gene Scott (at trial), Johnson City, Tennessee, for the appellant, Danny Lynn Davis; and Danny Lynn Davis (on appeal), pro se.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Tony Clark, District Attorney General; and Dennis Brooks and Erin McArdle, Assistant District Attorney Generals, for the appellee, State of Tennessee.

## OPINION

The evidence at the trial reflects that in the years 2003 through 2007, the Defendant was employed as the day-to-day coordinator of a Johnson City government program that paid for home improvements for low- and moderate-income homeowners and was reimbursed by the United States Department of Housing and Urban Development. Subject to review by two other city officials, the Defendant had authority to award contracts for less than $10,000 to the lowest bidder. During his employment, the Defendant submitted bids for contracted construction work through Gray Home Improvements (GHI), a company he operated and his wife owned. When the bids were accepted, the Defendant hired subcontractors to perform the work for less than the bid amount and kept the difference for his personal use. Homeowners were to sign a "Proposal" document that listed the terms of the contract and a second "Proposal" document that listed the specific improvements to be made. The Defendant signed these proposal documents listing GHI as the contractor, "by D.L. Neal." At times, the Defendant approved his own bid through GHI without obtaining bids from competitors. Some of the work for which GHI was paid was never performed, even though the Defendant, as D.L. Neal, signed documents certifying that the work had been completed. City officials knew nothing of the Defendant's actions until 2007. The Defendant admitted his actions but claimed that his conduct was not unlawful.

At the trial, Tennessee Bureau of Investigation Special Agent Scott Lott testified that he began investigating the Defendant's actions in May 2007. He compiled information about the home improvement contracts involving GHI and D.L. Neal into a spreadsheet, which was received as an exhibit. Among other information, the spreadsheet listed the amount paid to GHI by the city, the amount GHI paid the subcontractors who actually performed the renovation work, and the profit GHI made on each contract. He said his investigation revealed that the checks the city wrote to GHI were deposited into GHI's bank accounts and that after the deposits, the Defendant wrote checks to himself from the GHI accounts. He said that during his investigation, he obtained documents from GHI's banks, the city's records, and the Defendant's home.

Special Agent Lott testified and the documents he presented established that the Defendant systematically completed documents titled "Proposal" that listed the work to be

completed and the cost, bearing the signature D.L. Neal signing on behalf of GHI. A second document, also titled "Proposal," contained general terms to be accepted by the contractor and the homeowner for the work. These second proposal documents were signed by D.L. Neal on behalf of GHI and the homeowner. The Defendant then sent a memorandum to the city manager and the city's community development coordinator recommending disbursement of funds for the home improvements. The work permit was obtained by the subcontractor, not the Defendant as himself or as D.L. Neal. The Defendant signed a "Certification of Completion and Final Inspection" both as D.L. Neal in the capacity of contractor and Danny Davis as the inspector. He submitted a check request to the city treasurer for payment to GHI on behalf of the homeowner and requested that the check be returned to him. The check request listed a post office box that was registered to the Defendant's home address. Once received, the check was deposited into an account owned by "Lisa K Davis DBA Gray Home Improvements." The Defendant then obtained a cashier's check from the bank at which GHI had its account to pay the subcontractor that performed the work. The cashier's check lacked identifying information other than "Gray Home Improvements" typed as the remitter. Special Agent Lott testified that during his investigation, he found city records showing that Lloyd Osborne made bids for some of the contracts but was underbid by GHI.

Special Agent Lott read the Defendant's statement. In it, the Defendant acknowledged that he and D.L. Neal were the same person, that he established GHI, that he bid on city contracts through GHI, and that he sometimes called subcontractors to price the work before bidding. The Defendant said that GHI did not have a contractor's license but that its subcontractors did. He admitted that his city coworkers and the subcontractors did not know about GHI and that the subcontractors, not GHI, obtained the necessary permits. He admitted that he deposited the city's checks to GHI in an account and then paid the subcontractors with a counter check. The Defendant said he used GHI's profits from the contracts with the city to pay his personal expenses. The Defendant said his bids were fair.

On cross-examination, Special Agent Lott testified that he began his investigation on June 4, 2007. He acknowledged a May 30, 2007 memorandum from Steve Baldwin to Michael Peterson, the city manager, about the Defendant's actions. He said the city notified the police as soon as the city was aware of the Defendant's actions. He acknowledged that of the four homeowners he contacted, most stated that the work had been completed. He recalled one homeowner reporting that smoke detectors were not installed. He said, however, that all four homeowners denied signing some of the documents. He said he knew that the city's building inspectors sometimes certified renovation work by using the permits on file, rather than by completing an onsite inspection. He said that despite GHI's lack of a contractor's license, GHI had a city business license. He admitted that GHI's bank statements were in the Defendant's wife's name, not the Defendant's. He said the business's

3

checks were signed by the Defendant. He acknowledged that he did not know whether the city was reimbursed by the federal government for its payments for the home renovations and that he did not know whether the homeowners made any payments to the city.

On redirect examination, Special Agent Lott said he did not find anything in the city's records linking GHI to the Defendant. He said the investigation began because a contractor found checks that made him suspicious.

Steve Baldwin testified that he was Johnson City's Community Development Coordinator. He said the community development program's purpose was to provide affordable housing for low- and moderate-income individuals. He said the Defendant was a former employee of the department. He said he was the Defendant's supervisor from the time Mr. Baldwin's employment began until the Defendant's employment was terminated. He said that the program provided funds obtained from federal and state sources and from the city's general fund to homeowners for repairs and improvements affecting the health and safety of their homes. He described the program as a zero percent loan to the homeowners to make essential changes but not unnecessary cosmetic improvements. He said that a homeowner who obtained funding signed a deed of trust to obtain the loan but that the city released the lien if the homeowner lived in the home for a period of time that varied between three and five years, depending on when the loan was made and the source of the funds used. He said the homeowner repaid a prorated amount of the loan if he or she sold the home before the end of the time period. He said that the maximum funding for a homeowner was $25,000 and that city policy required approval of the city commission for any funding over $10,000. He said the city manager had authority to approve funding under $10,000. He said that the demand for the program exceeded its funding and that during the time that GHI was contracting through the program, there was always a waiting list of twenty-five to thirty homeowners seeking assistance. He said homeowners typically waited a year or longer unless they were prioritized as having emergency projects. He said that in the years 2003 through 2007, the program spent its funds for housing rehabilitation before the end of its fiscal year. He said the city began using money from its general fund to supplement the program in the 2006-2007 fiscal year. He said the city typically paid the contractor from the city treasury as the contracts were completed and then filed a quarterly reimbursement request with the federal government.

Mr. Baldwin testified that federal guidelines required obtaining three bids for each contract and documenting any instance in which three bids could not be obtained. He said the usual procedure was to approve the lowest bid. He said that the city officials accepted bids from general contractors who were licensed with the city and that they did not accept bids from subcontractors. He said that either a general contractor or its subcontractors were required to obtain permits for the work after a contract was awarded.

4

Mr. Baldwin testified that the Defendant was the day-to-day coordinator of the home rehabilitation program and said the Defendant was the only person who received bids and selected the lowest bid. He said that the Defendant's duties included verifying that a home needed work by personally inspecting it or having a building inspector go to the home and that it would be unusual if the contractor provided this information without someone from the city also visiting the home. He described the Defendant's job duties:

> [B]asically, from the time that an application became qualified under the program until such time as the rehab was completed all of the process that we've just talked about involving making sure adequate work write-ups were done, making sure the contractors were . . . brought in to bid on it, handling the process, handling the paperwork. These files had a lot of paper in them, every one of them do. And, basically, handling the . . . rehab program all the way through to the point where I . . . sign[ed] off on that.

He said that although he and the city manager "signed off" on the proposal, he was not involved again until the work was completed and the Defendant submitted the check request to him for approval. He said the city manager had the final authority to approve contracts of less than $10,000.

Mr. Baldwin testified that he would not have forwarded a request for approval of any projects if he had been aware that some of the work described would not be done. He said that when a request came to him, he believed that the necessary work had been properly determined and that all the work listed in the request would be completed. He said that GHI did a substantial amount of work for the program from 2003 until 2007 and that he never met D.L. Neal. He said he did not know that the Defendant was D.L. Neal or that the Defendant had any involvement with GHI. He recalled that a few months after GHI began contracting through the program, the Defendant told him that GHI "was probably going to be a good contractor for us, that indications were that they had done good work in what they'd done so far." He said he never authorized the Defendant to award contracts that would benefit the Defendant, nor would he, had he known of the Defendant's involvement with GHI.

Mr. Baldwin testified that the federal program that provided grant money required that homeowners be given a list of approved contractors and that a Receipt of Bids form be completed and certified. He said he reviewed the city's files in the spring of 2007 and found them lacking written bids from contractors who were not low bidders. He said bids for smaller projects were sometimes communicated by telephone. He said he trusted that the Defendant's certification of bids on the Receipt of Bids form was truthful.

5

Mr. Baldwin testified that the Certificate of Completion and Final Inspection must be signed by the homeowner, the contractor, and a witness, who was usually the Defendant as a representative of the program's office. He said payment could not be issued until this certificate was signed. He said that checks were typically sent to the Defendant at the program's office and that the Defendant notified the contractor the check was available.

Mr. Baldwin testified that his inquiry into the Defendant's dealings began after Lloyd Osborne raised concerns. He said that as a result of a meeting with Mr. Osborne, he reviewed the program's internal records for two projects Mr. Osborne called to his attention. He said that he also asked an employee in the building department to review its records for any permits obtained by GHI and that he discovered that subcontractors obtained all the permits for the GHI projects. He said he discovered that the program's files did not contain recorded deeds of trust for the homes at which GHI was awarded contracts, even though the Defendant was responsible for seeing that the deeds of trust were recorded. He said he requested a meeting with the city manager and the city attorney to review his findings.

On cross-examination, Mr. Baldwin admitted he knew that the Defendant also owned and worked on his own rental properties and sold real estate while a city employee. He said that to his knowledge, these were not unauthorized activities for city employees before June 2007. He acknowledged that the city did not enact a policy requiring employees to disclose personal interests in contracts with the city until June 2007. He admitted that the Defendant did not have authority to approve funding for contracts or to issue checks and that the Defendant's role was to submit the proposal letter for Mr. Baldwin and the city manager to approve.

Dwight Scott testified that he was a self-employed heating and air conditioning contractor. He said he came into contact with the Defendant at the courthouse for several years before the Defendant approached him about doing contract work. He said he began meeting the Defendant at homes and giving the Defendant quotes for heating and air conditioning work. He said that the Defendant usually had completed paperwork with him, that the Defendant wrote the price quote on the papers, and that he signed the papers onsite. He said the Defendant sometimes came to a home while he was completing the work. He said that he notified the Defendant when a job was completed and that the Defendant would call him a week or two later to notify him that his check was ready.

Mr. Scott identified exhibits involving heating and air conditioning work he completed for the Defendant. He said that he asked the Defendant why he never met D.L. Neal, given that Mr. Neal was signing GHI forms, and that the Defendant told him Mr. Neal worked out of town during the week. He said the Defendant claimed that when Mr. Neal's

father was on his deathbed, the Defendant promised to take care of the younger Mr. Neal. He said he believed the Defendant was only helping Mr. Neal take care of the business.

On cross-examination, Mr. Scott acknowledged that he was not sure the person to whom the Defendant claimed to have made the deathbed promise was D.L. Neal's father and that the Defendant might have said he made the promise to Doug Humphrey about Rocky Humphrey. He said the Defendant used several contractors. Although the trial exhibits contained representations that some of the homes had higher quality heating and air conditioning systems installed than those Mr. Scott said he installed, Mr. Scott said that he would not have substituted higher quality units because it was rare to find "much of a deal" on the units. He said his prices were reasonable, but he admitted that it was not unusual to give contractors a more favorable rate than homeowners due to the volume of work from contractors. He said the Defendant received favorable rates because the Defendant gave him a high volume of work.

Rocky Humphrey testified that during his father Douglas Humphrey's lifetime, his father operated Elite Construction. He said his father died in 2003. He said he knew the Defendant through his father and through the city's low-income home improvement program. He said he was a salaried employee of Elite Construction when his father was alive. He said that his father bid on city contracts and that he worked on some of the contracts awarded to Elite Construction.

Mr. Humphrey testified that after his father's death, he changed the name of the business to Elite Enterprises. He said that any checks the city issued to Elite Construction were for work done by his father's business and that checks issued to Elite Enterprises were for his business. He said Elite Enterprises completed three or four jobs for the city. He said that he quit doing business as Elite Enterprises in 2004 because he had trouble due to unpaid taxes and that he started painting. He denied that he made numerous bids for the city's program in 2004 through 2007 after he ceased operating Elite Enterprises for Elite Enterprises to do work for the city's home improvement program. He said the exhibits purporting to show bids by Elite Enterprises during this time period were inaccurate.

On cross-examination, Mr. Humphrey acknowledged that he received payment in his own name, Rocky Humphrey, for a few city projects. He admitted making bids and receiving contracts for some city projects in which he used subcontractors. He admitted he filed a claim for disability benefits about two months before the trial. He said he still painted but could no longer do heavy construction work. He admitted he had fifteen- to twenty-year-old felony convictions, including convictions for burglary, armed robbery, and four counts of attempted first degree murder. He also admitted he had a misdemeanor drug paraphernalia conviction from about a year before the trial, but he denied being "strung out" during the

7

time period for which he denied making the Elite Enterprises bids. He identified Lloyd Osborne as his former brother-in-law.

Howard Ray testified that he owned Ray's Heating and Air, which he had operated for about thirty years. He said he first met the Defendant when the Defendant came to his office and asked him to do work for the city's home improvement program. He said that the Defendant then called him to request quotes for work on homes and that he faxed estimates on his company letterhead to the Defendant at the city's telephone number. He estimated he completed ten to fifteen projects from 2003 until 2006 for the Defendant.

Mr. Ray testified that in order to be paid by the Defendant, he obtained a permit, faxed the Defendant an invoice, had the city inspection completed, and faxed the approval to the Defendant's office. He said that after completing these steps, he would receive a check within a week or two.

Mr. Ray identified two exhibits that he said were written bids requested by the Defendant. In the first, his bid called for less work and a larger heating and air conditioning unit at a lower price than the work, equipment, and dollar amounts stated in the city's project approval document for the same home. This contract was awarded to GHI at the higher price. The second bid Mr. Ray identified also called for less work and equipment at a lower price than the contract eventually approved and awarded to GHI for work at the same home.

On cross-examination, Mr. Ray testified that he did not recall without review of his records whether he completed the two projects about which he testified on direct examination. He acknowledged that he would not have replaced the power box at the second home because that was beyond his expertise. The record reflects that the approval document included replacement of the power box, although Mr. Ray testified that he wrote on his quote that no power box was needed. He said that he was required to obtain a permit for any work he did and that a general contractor could not obtain a permit for heating and air work on his behalf.

Sammy Fugate testified that he was self-employed as the owner of Fugate and Son Heating and Cooling. He said that the Defendant contacted him about heating and air conditioning work and that he knew the Defendant was employed by the city's home improvement program. He said that the Defendant called him and requested quotes on projects, that he would call the Defendant later with quotes, and that the Defendant called him again when he was selected to do the work. He said that in order to be paid for his work, he completed an invoice and submitted it to the Defendant at the Defendant's city office. He did not recall the Defendant being present at a job site. He said that he was unaware of GHI until the Defendant's trial and that he believed he had been working for the city. He said he

8

never met D.L. Neal. He estimated that he completed ten to twelve jobs at the Defendant's request. He said he completed these jobs for reasonable prices.

On cross-examination, Mr. Fugate said that the checks he received from the Defendant did not identify Johnson City but were drawn from Johnson City Federal Credit Union. He said he did not realize that the checks were not from the city until one was dishonored. He said that he notified the Defendant of the worthless check and that the Defendant brought a cashier's check to his office and exchanged it for the dishonored check.

David Giorgadze testified that he requested assistance from the city for home improvements. He said that after he met with the Defendant about installing wall heaters and receptacles, several people worked on his home for about two weeks. He said that the Defendant was not present while the work was being completed but that the Defendant inspected the work after its completion. He denied that he saw or signed a list of contractors. He said the Defendant never told him he had a choice of contractors. He said he never saw an exhibit that purported to be a proposal from GHI. He said he did not know D.L. Neal. He also denied that he signed the Certification of Completion and Final Inspection.

On cross-examination, Mr. Giorgadze testified that he was satisfied with the wall heaters installed at his home. He said that after the project was completed, an employee of a utility company came to his home and told him a heat pump would be more cost-effective to heat his home than wall heaters. He said he was advised that there was nothing he could do about it at that point. He did not recall the identity of the people who performed the work at his home other than that he thought two of them were father and son. He acknowledged that he had not been required to repay the city for the renovation.

Gladys Hardin testified that she requested assistance from the city for home improvement. She said that storm windows and central heating and air conditioning were installed but that she did not recall any renovation of her roof or gutters. She did not recall receiving a list of contractors from which she could choose to do the work. She said she did not recall signing a proposal or a Certification of Completion and Final Inspection. She acknowledged that the signature on the GHI proposal looked liked hers, but she did not think it was hers.

Betty Jo Odom testified that she was the office manager of Johnson City's Building Division. She said she and two other employees issued all of the city's construction permits. She said that after projects were completed, contractors called her office to request that the work be inspected. She said that her office previously entered data about the inspections but that the inspectors began entering their own data in June 2007.

9

Ms. Odom testified that she did not know nor had she heard of D.L. Neal. She said that at the request of Steve Baldwin, she obtained computer files about work at certain addresses. She said that a permit was required for any electrical work that required disconnecting the electricity. She said that a permit was not obtained for electrical work at the home about which Mr. Ray testified that no power box was needed and for which evidence demonstrated that GHI was paid for electrical installation. Ms. Odom testified that a general contractor could receive building permits for "building work" but not for electrical, plumbing, or heating and air conditioning projects, unless the general contractor was also licensed for these areas.

Hazel Lucille Gentry testified that she requested and obtained the city's assistance for home improvements. She said that Howard Ray installed a furnace and that Lloyd Osborne provided a new roof. She said that she had only recently learned of GHI and that she did not know D.L. Neal. She denied that signatures of her name on a GHI proposal, a Certification of Completion and Final Inspection, and a list of approved contractors were hers. She said she did not talk to the Defendant until she complained that some of the work she requested was not completed. She said she was advised by Steve Baldwin that not all of the improvements were eligible for the program. She acknowledged that she had not been required to repay the city for the work.

Lloyd Osborne testified that he was a general contractor and that he met the Defendant through Doug Humphrey, Mr. Osborne's former father-in-law. He said he was a subcontractor for Mr. Humphrey's company, Elite Construction, for several projects through the city's rehabilitation program. He said that he quit because of a disagreement with Mr. Humphrey but that the Defendant approached him about becoming a contractor. He said he obtained a contractor's license from the city and became an approved contractor for the program. He said this required that he obtain insurance, register to pay taxes, and attend a lead paint certification class.

Mr. Osborne testified that the Defendant typically called him and asked him to look at a home. He said he would evaluate the property and submit a written bid to the Defendant. He said he always submitted a written bid and never made bids by telephone. He said that the Defendant said the most urgent repairs should be made first and that the Defendant decided the scope of the work to be done. He said that in the fiscal year 2004-2005, he had over twenty contracts through the program but that he had fewer contracts in fiscal year 2005-2006. He recalled that there was a time in 2006 or 2007 when the Defendant was on medical leave that he was awarded four contracts in a row. He said it was unusual to receive this much work in a short period of time. He said that he continued to bid on projects after the Defendant returned to work but that he was not awarded any more contracts.

Mr. Osborne testified that he had several conversations with the Defendant about contracts he was not awarded and that the Defendant told him Hartley Electrician was receiving most of these jobs. He said the Defendant never said anything about GHI or D.L. Neal. He said he asked the Defendant several times whether there were projects on which he could bid. He said that on one of these occasions, he bid and was awarded the contract but that the Defendant told him the program was out of money for that year.

Mr. Osborne testified that he learned of GHI's involvement with the program after a discussion with Sammy Fugate. He said that Mr. Fugate showed him a check from GHI that had been returned for insufficient funds, which made him realize that Mr. Fugate had been paid for a project by GHI, not the city. He said he made inquiries in city offices but was unable to locate any permits obtained by GHI or a business license for GHI. He said Mr. Baldwin and another employee in the rehabilitation program's office told him they had never met the person who ran GHI in the four of five years they had been bidding and receiving contracts. He said he suspected that the Defendant was involved with GHI and that he met with Mr. Baldwin to discuss his suspicions.

Mr. Osborne identified six exhibits purporting to be bids on rehabilitation projects. He said that the signatures appeared to be his name, but that he did not sign the documents, and that the bid form used was not his. He said he was never aware that telephone bids were permissible. He said that he never signed contracts with homeowners or the city and that his written bids served as his contracts. He said the Defendant handled the contracts with the homeowners.

On cross-examination, Mr. Osborne testified that the Defendant said only a project under $5,000 could be approved as an emergency rehabilitation and that when he told the Defendant a home needed more work than could be done for $5,000, the Defendant told him the work would be split into smaller projects and completed over a period of time. He said the Defendant told him this was his method to avoid having to obtain the city commission's approval. He said that the Defendant sent him or other contractors to evaluate homes to determine the necessary work and that he advised the Defendant afterward. He said the Defendant then specified the portion of the work on which Mr. Osborne should bid. He said that after he performed work at a home where the work had been split, the Defendant sometimes called him later and told him to bid on another portion of the work. He said, though, that most of the time, he was not called to do a subsequent round of work.

On redirect examination, Mr. Osborne identified two exhibits that were written bids on his authentic form and bore his authentic signature. He said he always took a written bid to the Defendant or left it with another employee in the office. On recross-examination, Mr. Osborne testified that when he was awarded a contract, he had the homeowner sign his bid

sheet and that after he completed the work, he had the homeowner sign the Certificate of Completion and Final Inspection.

Frank Barry testified that he was the owner of Barry Heating and Air Conditioning. He said he knew the Defendant from the city's home improvement assistance program. He said that he provided written quotes for projects to the Defendant and that his company did the work on a couple of the projects. He said that after the work was completed, he faxed an invoice to the Defendant's attention at the Defendant's office and that he received a check within a week or two. He denied having heard of GHI or D.L. Neal. Mr. Barry testified that despite an exhibit reflecting a request for approval for his company to install several items at a residential property, his company was hired to complete only one of the items at a contract price that was less than reflected on the request for approval. He said that this property already had a sufficient electrical system for the heat pump his company installed, even though the request for approval listed upgrading the electrical system as one of the items to be completed. He acknowledged that he did not know whether the other was completed.

Terry Hartley testified that he was the owner of Appalachian Electric. He said he knew the Defendant and did work for the city's community development program. He said that he went to homes that needed work and then gave the Defendant a bid either by telephone or at the Defendant's office. He said he would sign a contract and then wait for approval. He said he completed the work if his bid won the contract. He said that after the work was completed and inspected, he submitted an invoice and was paid about a week later by GHI. He said he did not know D.L. Neal, nor had he ever met a representative of GHI. He said that when he had a question about his payment, he spoke with the Defendant, who said he would get in touch with "Denny" about it.

Mr. Hartley testified that at one home, he included electrical work in his original quote that was not authorized when the city approved the contract. The exhibits reflected that GHI was paid for this work but that GHI paid Mr. Hartley for only the authorized work. He said that he later did the work that had not been authorized the first time and that he was paid for the work at that point. The exhibits reflected that GHI billed the city and was paid for the same work at this home both times. Mr. Hartley provided estimates for work at other homes but received authorization to do only part of the work. The exhibits reflected that the Defendant wrote letters to the city manager requesting payment to GHI for both completed and uncompleted work, that GHI was paid for work that Mr. Hartley did not complete, and that GHI paid him only for completed work.

Michael Denis Peterson, the city manager, testified that he knew the Defendant through the Defendant's employment at the city's community development program. He said

that the city received a budgeted amount of grant money from the federal government and that the amount varied from year to year. He said that the city used the grant money for programs that benefitted low- and moderate-income people and for the community development program and that the city had to submit a grant request to the federal government that allocated the requested grant among the city's programs. He said he was unaware of any way a homeowner could access these funds other than through the city's program.

Mr. Peterson testified that he reviewed over 100 of the city's check requests weekly and that he had authority to approve requests under $10,000. He said that he had a general idea about the pricing for home improvements but that he did not always review the supporting documentation for check requests from the Defendant. He said that he trusted the accuracy of the documents the Defendant prepared and that he never had any reason to doubt the Defendant's job performance. He said that until the Defendant's employment termination, he had no personal knowledge of GHI or D.L. Neal, nor did he know that the Defendant was involved with GHI.

Mr. Peterson testified that outside the scope of their employment, city employees were not allowed to receive personal gain or do work for the city. He said that city employees were not prohibited from having second jobs that did not involve business with the city. He said he would not have approved any check requests for payment to the Defendant as Danny Davis, nor would he have approved contracts for rehabilitation work if he had known that GHI's bank accounts were in the Defendant's wife's name. He said the city's financial records were audited annually.

On cross-examination, Mr. Peterson acknowledged that he had final approval for city disbursements. He said that Steve Baldwin had to approve disbursement requests from the Defendant before they came to him. He said that the city paid from its own funds for work done through the community development program and was later reimbursed by the federal government. He was unaware of the city not being reimbursed for any of the contracts that were exhibits.

The trial court granted the State's motion to dismiss two counts of the indictment because the homeowner was ill and unable to testify. The Defendant did not offer any evidence. The trial court found the Defendant guilty of theft of property valued at $60,000 or more, official misconduct, and twenty-five counts of forgery. The Defendant filed this appeal.

As a preliminary matter, we address the State's argument that the Defendant has waived all but one of his issues by failing to cite legal authority to support his claims. The

13

State is correct that the Defendant's brief is deficient. The Rules of Appellate Procedure require citation to legal authorities supporting the appellant's arguments. T.R.A.P. 27(a)(7)(A). The rules of this court provide that issues not supported by citation to authorities will be waived. Tenn. R. Ct. Crim. App. 10(b). Because the Defendant is proceeding pro se on appeal and is allowed some leeway in drafting his pleadings, we evaluate the form of his brief with some leniency. See Hughes v. Rowe, 449 U.S. 5, 9-10 (1980); Young v. Barrow, 130 S.W.3d 59, 62-63 (Tenn. Ct. App. 2003). We likewise note that this court has within its discretion the authority to suspend the Rules of Appellate Procedure for good cause. See T.R.A.P. 2. We will consider all of the Defendant's issues on the merits. We caution, however, that a pro se appellant risks waiver of his issues by filing a brief that does not comply with the Rules of Appellate Procedure.

**I**

We consider first the Defendant's allegation that Johnson City lacked standing to allege the crimes. We note that the Defendant was prosecuted by the State of Tennessee under the State's criminal code. See T.C.A. § 39-11-103 (2010) ("Every person . . . is liable to punishment by the laws of this state, for an offense committed in this state, except where it is by laws cognizable exclusively in the courts of the United States."). The Defendant is not entitled to dismissal of the prosecution on this basis.

**II**

The Defendant contends that the prosecution of the forgery and official misconduct offenses was barred by the statute of limitations. The State contends that the prosecution was commenced within the statute of limitations. We agree with the State.

Forgery and official misconduct are Class E felonies. T.C.A. §§ 39-16-402(d) (official misconduct); 39-14-114(c) (forgery). The statute of limitations for Class E felonies is two years. Id., § 40-2-101(b)(4) (Supp. 2010).

The official misconduct count was alleged to have been committed between March 2003 and June 2007. The forgery counts were alleged to have been committed on various dates between May 2004 and May 2007. The Defendant was indicted on March 4, 2008, and an amended indictment was filed on July 6, 2009. The State alleged that the crimes were discovered on May 21, 2007. The counts that alleged crimes more than two years earlier also alleged that the statute of limitations was tolled by the Defendant's concealment of the crimes.

The Defendant argues that the prosecution was barred by the statute of limitations because more than two years passed between his arrest and the reindictment. This court has held that for purposes of determining whether a prosecution was commenced within the statute of limitations, an amendment to an indictment relates back to the time of filing the indictment, provided the amendment does not charge a new offense. State v. Johnson, 10 S.W.3d 280, 284 (Tenn. Crim. App. 1999). When the statute of limitations is tolled by a defendant's concealing his crime, the tolling ends when the concealment ends. State v. Davidson, 816 S.W.2d 316, 321 (Tenn. 1991).

We have reviewed both the original indictment and the reindictment and have determined that each count charged in the reindictment for which the Defendant was convicted corresponds with a count charged in the original indictment. The conviction counts in the reindictment did not charge any new offenses. The Defendant is not entitled to relief.

**III**

The Defendant contends that the evidence was insufficient to support his convictions. The State contends that the evidence was sufficient to support the convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The jury decides the weight to be given to circumstantial evidence and that "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marabel v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (quoting 2 Wharton's Criminal Evidence 1611). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Genaro Dorantes, No. M2007-01918-SC-R11-CD, ___ S.W.3d ___, slip op. at 12 (Tenn. Jan. 25, 2011). Likewise, appellate review of the

15

convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id., ___ S.W.3d at ___, slip op. at 9-12 (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

## Theft

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. §§ 39-14-103 (2010). In pertinent part,

> "Deprive" means to:
>
> (A)    Withhold property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner;
>
> . . .
>
> (C)    Dispose of property or use it or transfer any interest in it under circumstances that make its restoration unlikely[.]

Id., § 39-11-106(a)(8)(A), (C) (2006) (amended 2009). Consent is not effective if it is induced by deception. Id., § 39-11-106(a)(9)(A).

In the light most favorable to the State, the record reflects that the Defendant induced the city, through its agents, to enter into contracts with a business owned by his wife and operated by him. He accomplished this through deception of the city treasurer and the city manager by submitting "low bids" for projects, fabricating bids from other contractors, concealing his identity as D.L. Neal, concealing his involvement with GHI, and concealing his wife's ownership of GHI. The Defendant also forged Mr. Osborne's and homeowners' signatures, used a false identity, and falsified documents to deceive the city. Mr. Peterson testified that he would not have approved the payments to the Defendant if he had known of the Defendant's relationship with GHI and the Defendant's identity as D.L. Neal. In some cases, the Defendant received compensation twice for work that GHI's subcontractors performed only once. The Defendant admitted using the money he obtained for personal expenditures. The Defendant, acting through GHI, was paid from the city's treasury. His theft exceeded the $60,000 statutory threshold for a Class B felony. The evidence is sufficient to support the Defendant's conviction of theft of $60,000 or more.

16

In so holding, we have rejected the Defendant's argument that his actions were not illegal because he had "effective consent" to obtain a benefit as a municipal employee pursuant to the Johnson City Code. As we noted in section I. above, the Defendant committed an offense against the State of Tennessee and was prosecuted under the State's theft statute. See T.C.A. § 39-11-103. The Johnson City Code does not supersede the State's theft statute, and the question of whether the Defendant's actions complied with or violated the Johnson City Code is not determinative of whether he violated State law.

We have also rejected the Defendant's argument that Johnson City did not own the money he obtained. Mr. Peterson's testimony established that the federal government allocated money to the city through an annual grant. Once allocated, this amount was included in the city's annual budget. Within the parameters of the grant, the city had the discretion to spend the money as it saw fit. The city paid the Defendant, acting through GHI, from funds in the city treasury, and the city was reimbursed for its expenditures. Once the city received the grant, the money was its to spend for the approved uses. Although the Defendant argues that the federal government provided the money and that the city was only deprived of the money temporarily until it received reimbursements, these facts do not change the character of the city's ownership of the funds.

## Official Misconduct

The Defendant also challenges his official misconduct conviction. The State argues that the conviction was proper. We agree with the State.

The Defendant was charged with committing official misconduct by unauthorized exercise of official power. "A public servant commits an offense who, with intent to obtain a benefit or to harm another, intentionally or knowingly . . . [c]ommits an act relating to the servant's office or employment that constitutes an unauthorized exercise of official power[.]" T.C.A. § 39-16-402(a)(1) (2010).

The Defendant argues that the contracts for home improvement were made between the individual homeowners and the contractor and that the city was not a party. Although he argues that the homeowners approved all the work and the prices, the record reflects that by virtue of his authority with the city, he was able to forge homeowners' names on these documents. Mr. Giorgadze, Ms. Hardin, and Ms. Gentry denied that they signed a proposal, list of approved contractors, and certificate of completion and final inspection, even though their names were signed on these documents. The Defendant also fabricated bids from Mr. Osborne and used his work-related knowledge of the contents of authentic bids he received to submit a lower bid from GHI. The record also reflects that the Defendant submitted

requests for the city to pay GHI for work that was never performed at some of the homes and that he signed D.L. Neal's name on the certificates of completion and final inspection.

The Defendant also argues that it was neither a function of his employment duties for the city nor of the city itself to contract for improvements on private residences. He claims that his "primary function was to certify the eligibility of citizens to receive monetary assistance from the City of Johnson City with which the homeowners under private contracts could cause the repairs to be done." The evidence reflects, however, that the Defendant's job duties entailed assisting homeowners with the application process, obtaining competitive bids for each project, completing the necessary paperwork for the project to be accepted by the city for the program, completing the certificate of completion and final inspection, and requesting payment for the completed project. The contractors who testified stated that the Defendant, in his capacity as a city employee, solicited bids from them for projects, notified them if they were awarded the contract, and received their invoices. Acting as a city employee, the Defendant submitted false documentation to the city's management to perpetuate his scheme. The Defendant had authority to approve participation in the city's program for home improvement contracts of less than $10,000, and he split projects at some homes into two contracts in order to stay within his authority. The Defendant received bids from contractors for projects in his capacity as a city employee and took steps to conceal his alias of D.L. Neal and his involvement with GHI There is sufficient proof that he intentionally or knowingly obtained benefits through his unauthorized exercise of official power. The Defendant is not entitled to relief.

## Forgery

The Defendant challenges his forgery convictions on the basis that the State failed to prove that he harmed or defrauded the city, Mr. Osborne, Ms. Brown, Ms. Gentry, Ms. Hardin, or Mr. Giorgadze. The State contends that the Defendant signed documents with the names of others with the intent to obtain the city's money. We hold that the evidence is sufficient to support the forgery convictions for the Defendant's forgeries of Mr. Osborne's, Ms. Gentry's, Ms. Hardin's, and Mr. Giorgadze's names, and the forgery of the false name D.L. Neal. We hold, however, that the convictions for forgeries of Ms. Brown's name must be vacated.

"A person commits an offense who forges a writing with the intent to defraud or harm another." T.C.A. § 39-14-114(a). "'Forge' means to . . . [a]lter, complete, execute or authenticate any writing so that it purports to . . . [b]e the act of another who did not authorize that act[.]" Id., § 39-14-114(b)(1).

The Defendant's forgery convictions relate to:

18

Count 7 - forgery of Lloyd Osborne's name on a Solicitation of Quotes form in May 2004

Count 8 - forgery of Lloyd Osborne's name on a Solicitation of Quotes form in May 2004

Count 9 - forgery of Lloyd Osborne's name on a Solicitation of Quotes form in July 2004

Count 11 - forgery of Lloyd Osborne's name on a Solicitation of Quotes form in September 2004

Count 15 - forgery of Lloyd Osborne's name on a Solicitation of Quotes form in March 2005

Count 16 - forgery of Lloyd Osborne's name on a Solicitation of Quotes form in April 2005

Count 23 - forgery of Mary B. Brown's name on a Home Approval Proposal form on or about April 25, 2006

Count 24 - forgery of Hazel L. Gentry's name on a Home Approval Proposal form on or about April 25, 2006

Count 25 - forgery of Gladys Hardin's name on a Home Approval Proposal form on or about April 25, 2006

Count 26 - forgery of David Giorgadze's name on a Home Approval Proposal form on or about May 7, 2007

Count 27 - forgery of Mary B. Brown's name on a Certificate of Completion and Final Inspection form on or about September 5, 2006

Count 28 - forgery of Hazel L. Gentry's name on a Certificate of Completion and Final Inspection form on or about October 18, 2006

Count 29 - forgery of Gladys Hardin's name on a Certificate of Completion and Final Inspection form on or about November 24, 2006

Count 30 - forgery of David Giorgadze's name on a Certificate of Completion and Final Inspection form on or about May 21, 2007

Count 108 - forgery of a Certificate of Completion and Final Inspection form by signing the false name of D.L. Neal on or about September 25, 2006

Count 110 - forgery of a Certificate of Completion and Final Inspection form by signing the false name of D.L. Neal on or about September 29, 2006

Count 115 - forgery of a Certificate of Completion and Final Inspection form by signing the false name of D.L. Neal on or about November 20, 2006

Count 122 - forgery of a Certificate of Completion and Final Inspection form by signing the false name of D.L. Neal on or about January 4, 2007

Count 123 - forgery of a Certificate of Completion and Final Inspection form by signing the false name of D.L. Neal on or about January 25, 2007

Count 124 - forgery of a Certificate of Completion and Final Inspection form by signing the false name of D.L. Neal on or about January 29, 2007

Count 125 - forgery of a Certificate of Completion and Final Inspection form by signing the false name of D.L. Neal on or about January 26, 2007

Count 128 - forgery of a Certificate of Completion and Final Inspection form by signing the false name of D.L. Neal on or about April 12, 2007

Count 132 - forgery of a Certificate of Completion and Final Inspection form by signing the false name of D.L. Neal on or about April 30, 2007

Count 133 - forgery of a Certificate of Completion and Final Inspection form by signing the false name of D.L. Neal on or about May 9, 2007

We note that the trial court entered judgments of conviction for Counts 23 and 27, even though the trial court granted the State's motion to dismiss these counts because the homeowner whose name the Defendant allegedly forged was unable to attend the trial. These convictions are vacated. The record reflects that the Defendant intentionally created the remaining forgeries as part of his scheme to obtain money from the city that he would not have been permitted to obtain through honest means while he was employed by the city's rehabilitation program. Mr. Baldwin and Mr. Peterson would not have approved the projects or allowed GHI to be paid had they known that the Defendant was operating GHI and had created the fictitious person D.L. Neal for his own benefit. The Defendant's forgeries allowed him to deprive the city of money, despite the fact that the city had many more people to assist than funds to assist them.

The counts related to the Defendant's forgery of Lloyd Osborne's name on the Solicitation of Quotes forms alleged that the Defendant's intent was to defraud and harm the city. The Defendant created the fictitious bids from Osborne Construction to conceal his scheme to divert contracts to GHI for personal benefit. Mr. Baldwin testified that federal regulations required that three bids be obtained for each project and that the Defendant controlled the bid receipt and acceptance process. The evidence is sufficient to support the convictions for counts 7, 8, 9, 11, 15, and 16.

The forgery counts related to the Home Approval Proposals allege that the Defendant's intent was to defraud the city of Johnson City and/or the homeowners. In addition to the harm to the city discussed above, the record reflects that the Defendant's forgeries ensured there was an authentic-appearing contract, as he wanted it to exist in order for the project to take place for his benefit. He deprived the homeowners of the opportunity to review the repairs and improvements that were approved for their home. The convictions for Counts 24, 25, and 26 are sufficient on this additional basis.

The forgery counts related to the homeowners' names on the Certificates of Completion and Final Inspection likewise allege harm to the city and/or the homeowners. When the Defendant forged the homeowners' names, he deprived the homeowners of the opportunity to certify that the repairs and improvements completed at their homes were the

21

same as those listed in the Certificates of Completion and Final Inspection for which the city would pay the contractor. The homeowners signed deeds of trust giving the city a lien on the property in order to have the work done, not realizing that the Defendant forged the homeowners' names on the Home Approval Proposals and Certificates of Completion and Final Inspection in order to obtain personal benefits. The convictions in Counts 28, 29, and 30 are sufficient on this basis, as well.

The forgery counts related to the Defendant's signing the false name D.L. Neal on the Certificates of Completion and Final Inspection alleged that the Defendant's intent was to defraud the city. As noted above, these completed documents were necessary for the city to issue a check to the contractor. The Defendant's false signature of D.L. Neal deceived city officials into believing that they were issuing a proper payment to a contractor who properly completed its work and followed the program's procedures. The evidence is sufficient to support the convictions for Counts 108, 110, 115, 122, 123, 124, 125, 128, 132, and 133.

## IV

The Defendant contends that the trial judge should have recused himself because the judge's wife was an employee of the city of Johnson City. The State contends that the Defendant waived the issue when he abandoned it before trial. We agree with the State.

Defense counsel noted on the record at a pretrial hearing that the Defendant had instructed his attorneys not to request that the trial judge recuse himself even though the judge's wife was a city employee. The judge stated, "[I]t's not an issue."

A party who has a known basis for alleging potential bias of a trial judge must make a motion for recusal before the trial begins or any complaint is waived. See Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). In the present case, the Defendant knew that the trial judge's wife was a city employee and chose not to ask the judge to recuse himself. He is not entitled to relief.

## V

The Defendant contends that he was deprived of the opportunity to prepare a proper defense because the State failed to release his income tax records during discovery. The State contends that it had no obligation to release the records to the Defendant as discovery evidence because they were not exculpatory evidence. We hold that the Defendant is not entitled to relief.

The Defendant alleges that before trial, he repeatedly requested that the State "return" his wife's and his tax records. He alleges that he was not able to use the records as evidence at the trial. The record does not reflect that the Defendant sought a continuance on this basis. He has not explained how he would have used these records or how their contents would have assisted him in formulating his defense. In addition, we note that the Defendant has not alleged that he was unable to obtain these records himself by requesting them from the Internal Revenue Service. This court cannot speculate how the Defendant's tax records might have been beneficial to his defense. He has not shown that he is entitled to relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court in Counts 23 and 27 are vacated. The remaining judgments are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE